## Palfreeman et al. v. Broderick et al.

February 10, 1948.

W. Scott Miller, Judge.

Lawrence S. Grauman, Herman Cohen and Cohen & Fisher for appellants.

William J. Goodwin, Andrew W. Duncan, Gavin Cochran and James S. Shaw for appellees.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

L. M. Broderick, appellee, was adjudged a right of recovery of $2,000 against Thomas I. Palfreeman and his wife, the appellants, by virtue of a written contract of employment under which Broderick was to sell the Palfreemans' real estate within the terms of an offer contained in such contract.

George R. Griffin, appellee, was adjudged to have purchased this same real estate by his acceptance, through Broderick, of the Palfreeman offer before its expiration.

George H. Yenowine and his wife, appellees, having purchased this real estate directly from the Palfreemans within 15 minutes after the expiration of their Broderick offer, were required, by the chancellor's judgment, along with the Palfreemans, to convey the real estate in question to appellee Griffin and to surrender its possession to him.

The Palfreemans, our only appellants, are now contending that the chancellor's judgment granting a recovery to Broderick is erroneous because (1) he was not a licensed real estate broker and because (2) his contract had been rescinded. And they are further contending that the chancellor's judgment requiring appellee Yenowines to convey the subject property to appellee Griffin is erroneous because (3) all evidence indicated that the Yenowines had no knowledge of any prior purchase of the property by Griffin.

Evidence for the general picture indicates that Bro-

derick and the Palfreemans had been neighbors and friends for about 2 years; that the Palfreemans desired to sell their property so that they would receive $13,000 net on the sale; that Palfreeman himself prepared, to that end, a written instrument, dated March 8, 1946, and addressed it to Broderick; that the Palfreemans thereby offered to sell the property "thru you (Broderick) as agent" for $13,000 cash, "net without any real estate commission to be paid," and further provided therein that "any improvements" and "any advertising" were to be paid for by the agent (Broderick), and further provided therein that "this proposition is good until 12:01 P. M. on the 15th day of April 1946." Palfreeman and his wife signed that instrument and gave it to Broderick.

Evidence for Broderick indicates that he had never before sold any real estate but had customarily followed remodeling or carpenter work; that he, almost immediately after receiving the instrument signed by the Palfreemans, went to work in cleaning up the place and in improving its appearance; that he prepared and erected a "For Sale" sign on the premises and then advertised the proposed sale in 3 newspapers of Jefferson County, beginning on March 13th; that appellee Griffin thereafter came and looked at the property and left a deposit with Broderick; that Griffin signed, on March 16, 1946, his own written instrument, addressed and delivered to Broderick, by which Griffin agreed to pay $15,000 for the property and stipulated that "this proposition is good until 10:00 A. M. on the 26th day of March, 1946;" that Griffin had been willing, able and ready to buy the property, through Broderick, at $15,-000 at all times since March 21, 1946, when financial arrangements were completed. Broderick's evidence further indicates that the Yenowines, having also seen Broderick's advertising, likewise came and looked at the property, and deposited, on March 17, 1946, their own check with Broderick in token of their own desire to buy the property at $15,000 in the event of a failure of the Griffin deal for any reason. Broderick's evidence further indicates that the Palfreemans, after learning of Griffin's written acceptance of the property, through Broderick, at $15,000, would not convey to Griffin but, on the other hand, attempted to rescind their Broderick

instrument of March 8, 1946, and thereafter actually conveyed to the Yenowines on April 15, 1946, about 15 minutes after the termination time mentioned in the Broderick instrument itself.

Evidence for the Palfreemans indicates that they were told by Broderick that he was experienced in real estate transactions; that the Palfreemans were thus induced to execute and deliver the instrument of March 8, 1946; that they began to desire a rescission of the Broderick instrument as early as March 9, 1946, or the next day after execution and delivery to him of that instrument; that they fully, finally and formally rescinded it on March 14, 1946, when they informed Broderick to the effect that "all contracts on the sale were through;" that Griffin and Broderick both stated around April 9 and 10, 1946, that the Griffin deal had failed and that it would be satisfactory for the Yenowines to buy the property.

1. Our first question is whether Broderick, being an unlicensed real estate agent, was barred from recovering the $2,000 agent's fee for his services by reason of the provisions of KRS 324.320.

While the above statutory provision apparently does operate to bar Broderick's recovery under the mentioned condition, yet it must be noted that one of the preceding sections of the same law specifically excepts from the law's application any person "making casual sales of real estate for compensation." See KRS 324.010.

We believe that Broderick was within the exception provided by the law, since all the evidence seems to indicate that he was only a casual operator and since no evidence indicates that he ever made a sale of any real estate before this occasion. There was no evidence that he had maintained a real estate office or had held himself out as a real estate agent or had been paying his groceryman from proceeds of real estate operations. He was a carpenter, just as appellants say, and therefore he was not in any sense a real estate agent. This particular transaction was so casual as to be exceptional, somewhat like a man wearing a straw hat in December. Therefore, we are of the opinion that the chancellor correctly adjudged that Broderick was not barred by statu-

tory provisions from recovering the $2,000 fee in question.

2. The second question is whether the Broderick instrument of March 8, 1946, was rescinded by its makers, the Palfreemans, after its original execution and delivery.

Appellants direct our attention to the principle that a proposal of sale may be revoked before acceptance, as this court declared in the case of Walton's Ex'r v. Franks, 191 Ky. 32, 228 S. W. 1025. That is a sound and correct principle. But in the case at bar, we are dealing with the original Palfreeman proposal to Broderick, which proposal was immediately accepted by Broderick by his act of receiving it and by his further act of proceeding to find a buyer and by his further act of cleaning the property and by his further act of advertising the proposed sale. Even a unilateral offer, which was the precise nature of the Palfreeman instrument of March 8, 1946, may become a binding and enforceable contract upon acceptance before revocation. See Miles v. United Oil Co., 204 Ky. 345, 264 S. W. 761. Since the evidence of this case, either conclusively or at least substantially, indicates that the Palfreeman unilateral offer to Broderick was accepted by the latter and thus made a binding contract, the conclusion must follow that their agreement was, by its own terms, a faithful covenant until April 15, 1946, at 12:01 p. m., unchangeable as the law of the Medes and Persians. Therefore, the chancellor made no error, as we believe, in adjudging that there was no rescission of this binding compact prior to its extermination by the running of time according to its own tenor.

3. Our third question is whether the Yenowines were in such darkness relating to Griffin's previous acceptance of this property as to put themselves in the category of innocent buyers, thereby establishing unto themselves a right of legal protection over their own transaction.

On this question, we find Mr. Yenowine's own evidence indicating that he knew that "someone" was a prior prospect for the purchase of this property. He referred to that some one as a "G. I." The record shows that Griffin had been a member of the armed

forces in the late war. He was, therefore, in common parlance, a "G. I." And Yenowine apparently knew that this "G. I." was in earnest and had made a deposit and was trying to get a loan. He also knew or should have known, we think, that this unknown prospect probably would exercise his right to purchase the property. And while it is true that some of the evidence indicates that Griffin had abandoned his intention to purchase and had so stated to the Palfreemans and to the Yenowines, yet that is firmly denied by Griffin himself, who said he had been willing, able and ready to buy appellants' place ever since March 21, 1946. Thus, the chancellor's conclusion in this respect was supported by competent and probative evidence and should not now be disturbed by this court. Since one of the provisions of the chancellor's decree herein gave the Yenowines a recovery of the Yenowines' own paid deposit, with interest, the Yenowines would not appear to be very great sufferers from their involvement in the eruptions of this three-cornered misunderstanding.

We have held that a real estate broker—and this should include the casual, one-time trader, we think— is entitled to his commission if he, acting in good faith, procures a purchaser willing, able and ready to take the property upon the terms offered by his principal. See Lovejoy v. Reed, 302 Ky. 153, 193 S. W. 2d 1013. And that is what Broderick was—a procurer. And that is what Griffin was—a willing, able and ready purchaser within the offered terms. And that is what Palfreeman had to be—a principal with a principle. Therefore Broderick earned a commission—Griffin stood under the halo of contractual sanctity—Palfreeman had to be a keeper of the faith. A man's signed covenant, sealed in sincerity, paid for in the sweat of the obligee's efforts under it, terminable only at its own fixed time, should have a high degree of virtue, even such a virtue as that of the reputation of Caesar's wife, that is to say one entirely above any suspicion of its probable disruption.

Wherefore, we now find that the chancellor's judgment was supported by ample evidence and that it conformed to the established law and that it was free of the errors assigned by appellants.

Therefore, the judgment is affirmed.